**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**UNITED STATES OF AMERICA,**

v.                                                    **CRIMINAL ACTION NO. 2:20-cr-103-2**

**JENNIFER MICHELLE GARMON,**

       **Defendant.**

### *MEMORANDUM OPINION & ORDER*

Before the Court is Defendant Jennifer Michelle Garmon's Motion to Suppress. ECF No. 42. The Government filed a response and Defendant did not reply. ECF No. 43. The Court held a hearing on Tuesday June 1, 2021. ECF No. 55. For the reasons below, Defendant's motion is **DENIED**.

### I.  PROCEDURAL AND FACTUAL HISTORY

On November 5, 2020, the Government filed an Indictment charging Defendant and co-defendant Jeremey Wayne Johnson with Conspiracy to Distribute and Possession with Intent to Distribute 50 Grams or More of Methamphetamine, commonly known as "ice," in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A). ECF No. 1. On April 1, 2021, Defendant appeared before the Magistrate Judge where Defendant waived formal arraignment, entered a plea of not guilty, demanded a jury trial, and she was ordered to be detained pending trial. ECF Nos. 29, 32.

On April 23, 2021, Defendant filed the instant Motion to suppress all the evidence obtained in violation of the Fourth Amendment. ECF No. 42. According to the Indictment, on May 15, 2020, Jeremy Wayne Johnson rented a car to travel to Arizona. ECF No. 1 at ⁋ 1. On May 16, 2020, Johnson and Defendant Garmon traveled to Arizona to purchase methamphetamine for

distribution in Virginia. *Id.* at ¶ 2. On May 19, 2020, Johnson purchased methamphetamine through an associate of Garmon.

The following factual background is based on Defendant's motion to suppress and the Government's response and Exhibits. On May 20, 2020, at approximately 11:30 a.m., Arizona State Trooper M. Craft was patrolling Interstate 17 in Yavapai County, Arizona, when he observed a white Kia sedan with New York plates traveling northbound. Trooper Craft stopped the vehicle for speeding, driving at 80 mph in a posted 75 mph zone, and for texting and driving. Trooper Craft approached the white Kia on the passenger's side, Johnson lowered the front passenger's side window, and Trooper Craft explained the purpose for the stop.

Craft asked Johnson for his driver's license and Johnson identified himself as Kris Clark but did not have any form of identification. Johnson denied having any outstanding warrants or weapons in his possession. Johnson also identified the white Kia as a rental. Meanwhile, Defendant Garmon was a backseat passenger laying across the rear seat. Garmon also did not have any form of identification. Subsequently, Trooper Craft asked Johnson to exit the vehicle so Craft could issue a warning for the violations. As Johnson stepped out of the driver's door, and due to Johnson's behavior, Craft asked him to pull up his shirt. With his left hand, Johnson pulled up the left side of his shirt, keeping his right hand down at his right side as if concealing something. In response, Craft patted Johnson down and discovered a Ruger .380 handgun tucked into Johnson's pants under the right side of his shirt. At that time, Trooper Craft had Johnson wait at the front corner of Craft's patrol vehicle and called Trooper Huijkman for backup.

Trooper Huijkman arrived at 11:37 a.m. and his canine partner "Dublin" arrived on scene and was briefed by Trooper Craft. Trooper Craft asked Garmon to step out of the vehicle and asked Garmon how she knew Johnson. Garmon responded that he was a friend. Craft asked Garmon for

2

the driver's name, and she responded "Chris" but advised that the driver might spell it with a "K." Garmon stated the driver's last name was "Clark." Garmon stated the driver might have left his ID at the hotel. Garmon said that they were staying at the Scottsdale Resort and had been out in the area for three or four days.

Meanwhile, Trooper Craft went back to speak with Johnson again. Craft told Johnson that he (Johnson) was not being truthful concerning the length of his stay in Arizona. Trooper Craft asked Johnson about his identity and Johnson said that his name was "Kris Clark," and that his driver's license is from Virginia Beach, Virginia. Johnson also said they had been staying at the "Spotsville Plaza." Craft asked Johnson if he meant Scottsdale Plaza and Johnson agreed. Craft then attempted to confirm the spelling of Johnson's last name by repeating K-L-A-R-K bur Johnson responded C-L-A-R-K. Johnson told Craft his first name was spelled with a K. Craft asked Johnson to spell his first name. Johnson responded, "K-R-I-S . . . Kristopher." Johnson was placed in handcuffs and Craft advised Johnson he was not under arrest, but he was being detained due to his behavior. Trooper Craft ran a warrant check on the name of Kris Clark which came back with no outstanding warrants. The driver's license also came back as valid from Virginia. Then Craft asked whether Johnson whether he had ever been to prison before, and Johnson said yes. Craft asked if the gun was his, and Johnson said yes. Craft also confirmed the firearm was not reported stolen.

While Trooper Craft was completing the warning, Trooper Craft told Johnson and Garmon that they were being dishonest concerning the length of their stay in Arizona. Trooper Craft also asked the Garmon and Johnson whether there was anything illegal in the car. ECF No. 42 at Exhibit 1. Johnson answered, "No sir." Craft asked Johnson and Garmon whether they were responsible for everything in the car. Johnson answered, "Yes sir. There's nothing in there." Trooper Craft asked who rented the car. Johnson responded he rented the car. Craft asked Johnson and Garmon whether

3

they both had luggage in the trunk. Johnson and Garmon both answered yes. Craft asked for consent to search the car. Johnson answered, "Sure!" Johnson asked Craft why he wanted to search the car. Craft replied he believed Johnson and Garmon were involved in illegal activity. In response, Johnson told Craft he did not consent to search the vehicle.

Immediately thereafter, at approximately 11:55 a.m., Trooper Craft asked Trooper Huijkman to deploy his drug dog on the white Kia. At approximately 11:55 a.m., Trooper Huijkman commenced a screening of the white Kia with drug dog "Dublin." "Dublin" alerted on the driver's side window, trunk seam, and passenger's door. In the trunk, Trooper Huijkman discovered an opened potato chip bag containing approximately 865.43 grams of methamphetamine of 80% or greater purity. Johnson and Garmon possessed the 865.43 grams of methamphetamine. Johnson and Garmon were placed under arrest and secured in the rear of a patrol vehicle.

The Troopers drove the rental car to their office in Cordes Junction, Arizona. Continuing to search the vehicle now parked at their office, the Troopers discovered another 53.19 grams of methamphetamine of 80% or greater purity, a "loaded" syringe, a glass smoking pipe with residue, ten pills, a glass bong, a digital scale with crystal residue, another syringe, and a spoon. Johnson also admitted his identity as Jeremy Wayne Johnson, with a date of birth in 1976. Craft determined the Johnson was wanted in Virginia on a non-extraditable warrant for a drug offense.

At approximately 1:30 p.m., Detective D. Burns of the Arizona State Police advised Garmon of her *Miranda* rights. Garmon agreed to answer Burns' questions. Garmon admitted the purpose of their trip from Virginia to Arizona was to obtain methamphetamine for redistribution. Garmon advised she was going to be paid $800 to $900 for her part in the transaction. Garmon advised that methamphetamine was scarce in Virginia. At approximately 2:25 p.m., Johnson waived his *Miranda* rights and spoke with Det. Burns. Johnson admitted to traveling to Phoenix to buy drugs.

## II. LEGAL STANDARD

All evidence obtained in violation of the Fourth or Fifth Amendment must be excluded for the protection of a defendant's constitutional rights but also to deter Government violations. *See Pennsylvania Bd. of Probation and Parole v. Scott,* 524 U.S. 357, 363, (1998) (holding that the exclusionary rule is a prudential rule created by this Court to "compel respect for the constitutional guaranty.") (citing *Elkins v. United States,* 364 U.S. 206, 217, (1960)); *see also, Davis v. United States,* 564 U.S. 229, 236 (2011); *United States v. Calandra,* 414 U.S. 338, 348 (1974).

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Absent an exception, evidence seized in violation of the Fourth Amendment generally is subject to suppression under the exclusionary rule. *See United States v. Calandra,* 414 U.S. 338, 347–48, (1974).

The Fifth Amendment commands that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. V. The privilege extends not only "to answers that would in themselves support a conviction… but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant." *Hoffman v. United States,* 341 U.S. 479, 486 (1951). The right against self-incrimination attaches whenever a person is in custody and subject to interrogation. *Miranda v. Arizona,* 384 U.S. 436, at 467 (1966). The Supreme Court defined "custodial interrogation as "questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. An interrogation occurs when the suspects is subject to "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Therefore, "[a] confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under

5

*Miranda*... and the defendant knowingly, intelligently, and voluntary waives those rights." *United States v. Holmes*, 670 F.3d 86, 591 (citing *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997)). To protect this right, *Miranda* requires the government, to fully apprise the suspect during a custodial interrogation of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present ... if [he] so desires." *Id.* at 468-70. Notably, the Government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with *Miranda* and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Miranda*, 384 U.S. at 475. Accordingly, a violation of the Fifth Amendment "occurs when 'the accused is [1] compelled [2] to make a testimonial communication [3] that is incriminating.'" *United States v. Oloyede*, 933 F.3d 302, 309 (4th Cir. 2019) (quoting *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007)).

Accordingly, direct or derivative evidence obtained in violation of a defendant's Fourth, Fifth, or Sixth Amendment rights is fruit of the poisonous tree that may be excluded unless one of the three recognized exceptions applies. *See Wong Sun v. United States, 371 U.S. 471, 488 (1963)*. First, if there were intervening factors, such as a significant amount of time or actions by the defendant or third parties, the Court must consider those factors to determine whether the illegal Government activity was so far attenuated from the eventual discovery of evidence that it serves no legitimate purpose to suppress it. *See United States v. Najjar,* 300 F.3d 466, 476 (4th Cir.2002) (holding evidence "need [not] be suppressed if it is somehow attenuated enough from the violation to dissipate the taint."); *see also, United States v. Lentz*, 524 F.3d 501, at 522 (4th Cir. 2008) (holding that there is "'per se' or 'but for' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that

began with [the constitutional violation].") (citing *United States v. Ceccolini*, 435 U.S. 268, 276 (1978) (internal quotation marks omitted)). Second, the independent source doctrine states that illegally seized evidence is admissible if that evidence was also obtained legally by another means. *See United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019) (holding that evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality, may be admitted at trial.); *see also, Murray v. United States*, 487 U.S. 533, 537 (1988). Finally, the inevitable discovery doctrine states that the items may not be suppressed if the government establish by a preponderance of the evidence that law enforcement would have "ultimately or inevitably" discovered the evidence by "lawful means." *Nix v. Williams*, 467 U.S. 431, at 444 (1984); *see also Utah v. Strieff*, 136 S. Ct. 2056, at 2061 (2016); see also, *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017). "Lawful means" include an inevitable search falling within an exception to the warrant requirement, such as an inventory search, that would have inevitably uncovered the evidence in question. *United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998).

Finally, in a plurality decision, the Supreme Court held that the Self-Incrimination Clause "is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *United States v. Patane*, 542 U.S. at 636. Rather, "[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy for any perceived Miranda violation," such that the "fruit of the poisonous tree" doctrine that applies in other contexts is inapplicable in this context. *Id*. at 641-42. In *Patane*, the Court reasoned that the *Miranda* rule "does not require that the statements [taken without complying with the rule] and their fruits be discarded as inherently tainted," *Oregon v. Elstad*, 470 U.S. 298, at 307 (1985). The Court further argued that such blanket suppression rule could not be justified by reference to the "Fifth Amendment goal of assuring trustworthy evidence"

or by any deterrence rationale. *Id.* at 308; *see also, Michigan v. Tucker,* 417 U.S. 433, at 446–449, (1974) (creating an exception to the fruit of the poisonous tree doctrine by admitting the testimony of a witness who was discovered because of an unwarned custodial interrogation). That is the Supreme Court has held that evidence obtained following unwarned interrogations may be admissible based on the Court's recognition that the concerns underlying the *Miranda* rule must be accommodated to other objectives of the criminal justice system. *See New York v. Quarles,* 467 U.S. 649, at 657 (1984) (concluding "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"); *see also, Harris v. New York,* 401 U.S. 222. Therefore, a majority of the Court held that the concerns underlying the *Miranda* "rule must be accommodated to other objectives of the criminal justice system." *Patane,* 542 U.S. at 644.

## III.  DISCUSSION

### A.  Fourth Amendment Analysis

The Fourth amendment protects people against unreasonable searches and seizures. For a search to be reasonable, it must be supported with probable cause.

### 1.  Standing: Reasonable Expectation of Privacy in Rental Car

As an initial threshold matter, for Defendant Garmon to bring a cognizable Fourth Amendment claim and exclude the alleged unlawfully seized evidence, she must first establish standing. That is, Garmon must show that she had a reasonable expectation of privacy in the place searched (e.g. the rental car). However, "[b]ecause Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim."

*Byrd v. United States*, 138 S. Ct. 1518, at 1530 (2018). Still, the Court must determine whether Garmon had a reasonable expectation of privacy in the rental car.

Before seeking relief for an unconstitutional search. It is well settled that one who owns and possesses a car, like one who owns and possesses a house, almost always has a reasonable expectation of privacy in it. However, more difficult is the instant situation where Defendant was a passenger in a rented vehicle which was rented out to a third-party, Kristopher Clark, who was not occupying the car at the time of the search.

On the one hand, it is by now well established that a person need not always have a recognized common-law property interest in the place searched to be able to claim a reasonable expectation of privacy in it. *See Katz v. United States,* 389 U.S. 347, at 352 (1967); *Mancusi v. DeForte,* 392 U.S. 364, at 368 (1968); *Minnesota v. Olson,* 495 U.S. 91, at 98 (1990). On the other hand, "'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search." *Rakas v. Illinois,* 439 U.S. 128, at 141 (1978). For example, "a person present in a stolen automobile at the time of the search may [not] object to the lawfulness of the search of the automobile." *Id.* at 141, n. 9. This is so because no matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car. *Byrd v. United States,* 138 S. Ct. 1518, at 1529 (2018). Nevertheless, "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [the] right to exclude," *Rakas,* 439 U.S. at 144, n. 12. Moreover, there is a distinction "between the Fourth Amendment rights of passengers and the rights of an individual who has exclusive control of an automobile or of its locked compartments." *Id.* at 154. In *Jones,* for example, the Supreme Court held that a defendant who did not own an apartment still had a reasonable expectation of privacy in his friend's apartment because the defendant "had complete

dominion and control over the apartment and could exclude others from it." *Id.* at 149 (citing to *Jones v. United States*, 362 U.S. 257 (1960)). Accordingly, there is "no reason why the expectation of privacy that comes from lawful possession and control and the attendant right to exclude would differ depending on whether the car in question is rented or privately owned by someone other than the person in current possession of it." *Byrd,* 138 S. Ct. at 1528 (2018). Thus, the key inquiry before the Court is not whether Defendant Garmon had a reasonable expectation of privacy in a rented vehicle, rather it is whether Garmon was in lawful possession of the vehicle.

Here, co-defendant Johnson was the driver of the rented car, the white Kia. *See* Hr'g Tr. at 15:14-21; *see also,* ECF Nos. 43, 55. Yet, neither Johnson nor Defendant Garmon were on the rental agreement as authorized drivers or occupants. *See* ECF No. 43 at Exhibit 1. Rather, the rental agreement states that, on May 15, 2020, Enterprise rented the vehicle to a "Kristopher Clark" from Virginia Beach. *Id.* Notably, there are no other additional drivers listed on the rental agreement. As anyone who has rented a car knows, car-rental agreements are filled with long lists of restrictions. For example, only authorized drivers can drive the vehicle and authorized drivers must obey by all federal and state driving laws. Accordingly, the Government contends that since neither Johnson nor Garmon were on the rental agreement, neither were in lawful possession of the rental car, and, thus, neither have a reasonable expectation of privacy. ECF No. 43; *see also, United States v. Wellons*, 32 F.3d 117, at 119 (4th Cir. 1994) (the Court upheld a search of a rental car where the driver/defendant was not listed as an "authorized driver" on the rental agreement). In the alternative, the Government argues that even if Johnson and Garmon did have lawful possession, Garmon did not have a reasonable expectation of privacy in the rented vehicle because she was only a passenger. *Id.; see also, United States v. Carter*, 300 F.3d 415, 421 (4th Cir. 2002)

(holding that passengers in searched vehicles have no reasonable expectation of privacy in regard to items found in another's vehicle).

The Court finds that the Government's arguments are unmerited. The Supreme Court has held that although a defendant may violate a rental car agreement signed by third party, driving a rental car while not listed as an authorized driver *does not* eliminate any reasonable expectation of privacy a defendant has in the vehicle. *Byrd*, 138 S. Ct. at 1518 (2018). Thus, the driver is protected by the Fourth Amendment against a warrantless search of the vehicle. *Id.* Moreover, the Supreme Court also held that "for Fourth Amendment purposes there was no meaningful difference between agreement's authorized-driver provision and other restrictions in rental car agreements, such as prohibitions on driving the car on unpaved roads or driving while using a handheld cellphone...." *Id.* Furthermore, *Rakas* instructs that a passenger also has a reasonable expectation of privacy in rented vehicle so long as they have permission to exercise control and dominion over the car. *Rakas v. Illinois,* 439 U.S. 128, at 141 (1978).

Accordingly, in the instant case, it does not matter that neither Johnson nor Garmon were not authorized drivers of the rented vehicle. Also, it does not matter that Garmon was a passenger in a rented vehicle. Still, it does not matter whether Johnson or Garmon violated the rental agreement while they operated the vehicle. Rather, the key inquiry before the Court is whether Johnson and/or Garmon had lawful possession to the rented vehicle and, thus, had the lawful right to exercise dominion and control over the rental vehicle and could exclude others from it. If Garmon and Johnson had lawful possession of the vehicle, then they had a reasonable expectation of privacy.

In the hearing, Homeland Security Investigations ("HSI") Special Agent George Fox testified that he investigated whether Johnson and Garmon lawfully possessed the rental vehicle. *See* Hr'g Tr. at 88:18-89:6. As noted above, the vehicle was rented by a "Kristopher Clark" who is a resident

of Virginia Beach. ECF No. 43 at Exhibit 1; *see also*, ECF No. 55 at Exhibit 7 (Enterprise Rental Records). Agent Fox testified that while Kristopher Clark is an actual person who lives in Virginia Beach, he could not contact Mr. Clark to confirm his relationship with Johnson or Garmon. *See* Hr'g Tr. at 88:18-89:12. Moreover, Agent Fox did not confirm whether Johnson or Garmon used fraudulent means to rent the vehicle, stole the rented vehicle, or whether Mr. Clark knew of the drug conspiracy. *See* Hr'g Tr. at 89:7-90:10. Accordingly, the Government did not establish that Johnson or Garmon used fraudulent or illegal means to rent the car. Thus, the Government failed to show that Johnson or Garmon were in unlawful possession of the rented vehicle.

As a result, the Court finds that because Kristopher Clark is an existing third-party who lawfully rented the vehicle, the Court can reasonably infer that Mr. Clark authorized Johnson and Garmon to occupy it. Thus, Garmon had a reasonable expectation of privacy in the rented vehicle.

**2. Evaluating Scope of the Search after Conducting Lawful Traffic Stop**

After determining that Garmon had a reasonable expectation of privacy, the Court must now determine whether the dog-sniff search that prolonged the traffic stop was supported by individualized reasonable articulable suspicion, and, thus, constitutional. In the instant motion, Defendant Garmon's primary contention is that the scope and duration of the detention were unreasonable, in violation of her Fourth Amendment rights. ECF No. 42 at 4-6.

It is well established that the stop of a vehicle by the police amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has held that "[b]ecause an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest, [the Court] analyzes the propriety of a traffic stop using the dual inquiry announced in the Supreme Court's holding in *Terry v. Ohio*, 392 U.S. 1, 19–20 [] (1968)." *United States v. Green*, 740 F.3d

275, 279 (4th Cir. 2014); *see also, United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992). Accordingly, the Fourth Circuit instructs that the Court must consider "first whether the officer's actions were justified at their inception and second whether his subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Green*, 740 F.3d at 279 (internal quotes omitted).

Here, the first prong of the *Terry* analysis is satisfied because it is undisputed that on May 20, 2020 at approximately 11:30 a.m., on Interstate 17 at Milepost 267 in the State of Arizona, Trooper M.R. Craft conducted a lawful traffic stop of the rented vehicle (New York license plate JSG6394) because Johnson, the driver, was speeding, in violation Arizona Revised Statutes ("ARS") § 28-702.04B, and texting while driving, in violation of ARS § 28-914. ECF No. 43; *see also,* ECF No. 42 at 2-3. Thus, Trooper Craft conducted a lawful traffic stop of the rented vehicle, had probable cause to investigate within the scope of the traffic violation, and could lawfully seize Johnson and Garmon for the duration of the traffic stop investigation. *See Arizona v. Johnson,* 555 U.S. 323, at 333 (2009) (A traffic stop "begins when a vehicle is pulled over for investigation of a traffic violation" and ends "when the police have no further need to control the scene, and inform the driver and passengers they are free to leave."); *see also, id.* at 327 ("For the duration of a traffic stop... a police officer effectively seizes 'everyone in the vehicle,' the driver and the all passengers.") (quoting *Brendlin v. California,* 551 U.S. 249, at 255 (2007).

Second, however, Defendant argues that Trooper Craft's subsequent actions were not reasonably related in scope to the circumstances that justified the traffic stop because Craft prolonged the investigation and deployed a K-9 unit to conduct a sniff-search of the vehicle. ECF No. 42 at 4-5. Although, a dog-sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures, the question before the Court, in

evaluating the second *Terry* prong, is whether Trooper Craft exceeded the scope of the traffic stop mission by deploying a dog-sniff *after* completing the traffic stop. *Illinois v. Caballes,* 543 U.S. 405 (2005) (holding that a dog-sniff conducted during a lawful traffic stop does not violate the Fourth Amendment). Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Caballes,* 543 U.S., at 407; *see also United States v. Sharpe,* 470 U.S. 675, 685 (1985); *Florida v. Royer,* 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."); *Rodriguez v. United States,* 575 U.S. 348, at 354 (2015). However, a traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. *Caballes,* 543 U.S., at 407.

Thus, the Court must conduct a detailed analysis of the stop at each time frame to determine whether Trooper Craft and Trooper Huijkman exceeded the scope of the traffic stop at any time and whether, during the stop, Trooper Craft acquired individualized reasonable suspicion to lawfully prolong the traffic stop to include the dog-sniff search.

In determining whether the stop or prolonged detention was reasonable, courts are encouraged to rely on the judgement of experienced law enforcement. *See e.g., United States v. Lender,* 985 F.2d 151, 154 (4th Cir. 1993); *United States v. Arvizu,* 534 U.S. 266, at 273-74 (2002) (permitting "officers to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (internal quotation omitted); *Branch,* 537 F.3d at 336-37. Furthermore, the Fourth Circuit has recognized various factors to support finding reasonable articulable suspicion as a basis for prolonging a traffic stop. *See, e.g., United States v. Vaughan,* 700 F.3d 705, 710–12 (4th Cir. 2012)

(nervousness of driver and passenger, conflicting stories about their travel, and presence of four cellular telephones, two of which were of the pre-paid variety, constituted reasonable suspicion to prolong stop until canine unit arrived approximately 16 minutes later). The Fourth Circuit has held that factors supporting the officer's reasonable suspicion during a stop "must in their totality serve to eliminate a substantial portion of innocent travelers" and demonstrate a connection to criminal activity. *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015).

### a. *The Initial Traffic Stop*

As noted above, it is undisputed that Johnson and Garmon were lawfully stopped because Johnson was speeding and texting while driving. Thus, Trooper Craft had probable cause to seize the vehicle and this was not a pretextual stop. *See Delaware v. Prouse*, 440 U.S. 648, at 661 (1979) (the Court expressly distinguished from a pretextual stop which would require a reasonableness balancing test to a stop based on "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations."); *see id.*, at 654-55 (The Court noted that enforcing traffic and vehicle safety regulations upon observed violations affords the "'quantum of individualized suspicion'" necessary to ensure that police discretion is sufficiently constrained.) (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, at 560 (1976)). Accordingly, in the instant case, the mission of the stop was to address the traffic violations of speeding and texting while driving. ECF Nos. 42, 43; *see also*, Hr'g Tr. at 10:24-11:20.

In the hearing Trooper Craft also testified that when he caught up to the white Kia, he searched the vehicle's plates in the DEASIL plate reader system which showed that the white Kia was captured traveling westbound on I-40 in Holbrook, Arizona towards Phoenix on May 18, 2020. *See* Hr'g Tr. at 12:4-16. Then, Trooper Craft testified that based on his years of experience and knowledge of drug trafficking cases in Arizona, it was suspicious that less than two-days after

15

arrival, the white Kia would be traveling on Interstate 17 at Milepost 267 near Holbrook, about three hours outside of Phoenix and exiting Arizona. *See* Hr'g Tr. at 12:4-16; *see also, id.* at 18:19-25; *see also,* ECF No. 55 at Exhibit 4 (General Map of Arizona). Based on his experience, Trooper Craft testified that the vehicle's quick travel in-and-out of Arizona was consistent with drug trafficking prevalent in the region. *See* Hr'g Tr. at 28:13-24. Moreover, Trooper Craft testified that the policy for stopping vehicles traveling approximately 80 miles per hour in a 75 MPH zone was discretionary. *See* Hr'g Tr. at 83:8-18. In this case, Trooper Craft exercised his discretion to stop the speeding vehicle because Johnson was also texting while driving. *See id.*

Accordingly, Trooper Craft had a lawful basis for initiating the traffic stop and conduct an investigation which "beyond determining whether to issue a traffic ticket, an officer's mission during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez,* 575 U.S. at 349 (2015) (citing *Delaware v. Prouse,* 440 U.S. 648, at 658–659); *see also, United States v. Rusher,* 966 F.2d 868, 876 (4th Cir. 1992) (holding that during a routine traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation."). However, "[l]acking the same close connection to roadway safety as the ordinary inquiries, a dog-sniff is not fairly characterized as part of the officer's traffic mission." *Id.*

After stopping the vehicle, Trooper Craft approached the passenger's side, and Johnson lowered the front passenger's side window approximately two inches. ECF Nos. 42, 43. At this time, Trooper Craft explained to Johnson the purpose for the stop. *Id.* In the hearing, Trooper Craft testified that when he approached the front passenger's side window, he observed a cell phone atop Johnson's leg and could see that Johnson was in the process of sending a text, which Johnson

did not deny he was doing. ECF No. 43 at 2; *see also* Hr'g Tr. at 17:15-18:3. Trooper Craft then asked Johnson for his driver's license and Johnson said he did not have his driver's license but said that his name was "Kris Clark." *See* Hr'g Tr. at 18:4-11. During this initial questioning, Trooper Craft observed that Johnson was sweating profusely and breathing heavily. *See* Hr'g Tr. at 18:19-19:22. Then, Trooper Craft asked Johnson whether he had any outstanding warrants or weapons in his possession and Johnson answered "No" to both questions. *See* Hr'g Tr. at 20:2-11. Next, Trooper Craft asked Johnson for the paperwork for the vehicle and Johnson identified the white Kia as a rental but said he did not have the rental agreement. *See* Hr'g Tr. at 20:14-20. Moreover, while Craft was at the car window, Garmon was in the backseat laying across the rear seat of the white Kia and she avoided eye contact with Trooper Craft. ECF Nos. 42, 43; *see also,* Hr'g Tr. at 17:3-11. Craft also asked Garmon whether she had a driver's license, and she answered no. Finally, Craft asked Johnson again whether he had any weapons and, again, Johnson denied he had any weapons.

At this stage, the Court finds that Trooper Craft's initial traffic stop was lawful, and he did not exceed the scope of traffic stop by asking these initial questions. Critically, the Court finds that, at this point, Trooper Craft identified that following combined factors that would come to support his reasonable articulable suspicion that criminal activity was afoot: the vehicle's quick in-and-out of Arizona based on the DEASIL plate reader system, the lack of licenses or identification for both Johnson and Garmon, the lack of the rental agreement, and Johnson's abnormal physical demeanor notwithstanding the Arizona heat. *See United States v. Vaughan,* 700 F.3d 705, 710–12 (4th Cir. 2012) (nervousness of driver and passenger, conflicting stories about their travel, and presence of four cellular telephones, two of which were of the pre-paid variety, constituted reasonable suspicion to prolong stop until canine unit arrived approximately 16 minutes later).

However, at this stage, the Court does not credit the fact that the front passenger's side window was lowed approximately two inches because there is no constitutional requirement that the window be fully open or lowered for someone to cooperate with a traffic stop. *See United States v. Palmer*, 820 F.3d 640, at 649 (4th Cir. 2016) (suspicion of illegal window tinting sufficient to justify stop and totality of circumstances sufficient to establish reasonable suspicion justifying further investigation). Moreover, the Court does not credit the fact that Garmon avoided eye contact with Trooper Craft as supporting reasonable articulable suspicion because that on its own is not sufficient. *See Illinois v. Wardlow*, 528 U.S. 119, at 130–31 (2000) (Justices Stevens, Souter, Ginsburg and Breyer concurring) ( "[A]n innocent person—even one distrustful of the police— might 'avoid eye contact or even sneer at the sight of an officer,' and that would not justify a *Terry* stop or any sort of *per se* inference.") (citing *United States v. Sokolow,* 490 U.S. 1, at 8-9 (1989)). Both circumstances would not substantially distinguish innocent travelers with those suspected of criminal activity. *See United States v. Williams*, 808 F.3d 238, at 246 (4th Cir. 2015) (factors supporting the officer's reasonable suspicion during a stop "must in their totality serve to eliminate a substantial portion of innocent travelers" and demonstrate a connection to criminal activity).

      *b. Asking Johnson To Exit the Vehicle, Pat Down, and Seizing the Weapon*

Subsequently, Trooper Craft asked Johnson to exit the vehicle so Craft could issue a warning for the violations. At this stage, Trooper Craft was still acting within the scope of the Fourth Amendment. *See Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (holding that once a motor vehicle has been lawfully detained for a traffic violation, the police officer may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures).

After Johnson stepped out of the driver's door, Trooper Craft asked Johnson again whether he had any weapons and Johnson said no. However, based on Johnson's behavior, Trooper Craft testified that he then asked Johnson to pull up his shirt. ECF No. 43; *see also*, Hr'g Tr. at 22:1-10. Based on the video evidence presented in the hearing, Trooper Craft testified that, with his left hand, Johnson pulled up the left side of his shirt keeping his right hand down at his right side as if concealing something. *See* Hr'g Tr. at 22:18-23:1; *see also*, ECF No. 55 at Exhibits 1 and 2 (Video of Traffic Stop). In response, Trooper Craft patted Johnson down and discovered a Ruger .380 handgun tucked into Johnson's pants under the right side of his shirt. *See* Hr'g Tr. at 23:4-24. Then, Craft asked Johnson whether he was planning to shoot him (Craft). *See* Hr'g Tr. at 24:1-7. Johnson claimed he forgot he had the gun on him. *See* Hr'g Tr. at 24:8-13. Craft responded that people do not forget they have a firearm on their person. *Id.* At this time, Trooper Craft had Johnson wait at the front corner of Craft's patrol vehicle and called Trooper Huijkman for backup. *See* Hr'g Tr. at 24: 17-24. Trooper Craft then asked Johnson whether the gun was his and Johnson answered in the affirmative. *Id.* Trooper Craft asked Johnson whether he had ever been to prison, and Johnson responded in the affirmative. *See* Hr'g Tr. at 25:3-15.

Then, Trooper Craft asked Johnson why neither he nor his passenger had a driver's license. Johnson responded he had a license but left it at the hotel. *See* Hr'g Tr. at 26:2-9. Trooper Craft asked Johnson about their destination and Johnson responded they were traveling "home" to Virginia Beach, Virginia. *See* Hr'g Tr. at 26:11-13. Trooper Craft asked Johnson for his name and he replied "Kris Clark" and provided December 1979 as his date of birth. Trooper Craft asked Johnson how long they (Johnson and Garmon) had been "out this way," and Johnson initially answered five days. *See* Hr'g Tr. at 26:20-27:3. Based on the DEASIL plate reader system, Trooper Craft informed Johnson that he (Johnson) was not being truthful concerning the length of his stay

in Arizona. *See* Hr'g Tr. at 27:4-21. Johnson then stated he had been in Arizona for four days. *See* Hr'g Tr. at 29:21-30:4. Craft asked Johnson where his driver's license was from and Johnson responded Virginia Beach, VA. *Id.* Craft then asked Johnson where he stayed while in the Phoenix area but Johnson had difficulty remembering before finally responding, "Spotsville Plaza." Craft asked Johnson if he meant Scottsdale Plaza and Johnson agreed. *See* Hr'g Tr. at 30:15-21.

Craft asked Johnson whether his first name was "Kris" or "Kristopher" and Johnson answered "Kris." *See* Hr'g Tr. at 31:10-33:1; *see also*, ECF No. 55 at Exhibits 1 and 2 (Video of Traffic Stop). Craft asked Johnson for his Social Security number and Johnson provided an SSN ending in 6468. Craft attempted to confirm the spelling of Johnson's last name by repeating K-L-A-R-K. *Id.* Johnson responded C-L-A-R-K. Johnson told Craft his first name was spelled with a K. Craft asked Johnson to spell his first name. Johnson responded, "K-R-I-S . . . Kristopher." *Id.* At this pointed, Trooper Craft asked Trooper Huijkman to place Johnson in handcuffs. *Id.* Craft advised Johnson he was not under arrest, but he was being detained due to his behavior. Trooper Craft then searched the driver's license name which came back as valid from Virginia.

With respect to the pat down, although the Defendant argues that Trooper Craft went beyond the scope of the traffic stop, the record shows that Trooper Craft had an articulable suspicion that Johnson had a weapon on him. Moreover, even if the pat down search went beyond the scope of the traffic stop, the Court finds that it was reasonable for Trooper Craft to conduct the pat down

pursuant to the reasonableness balancing test[1] in light of officer safety given Johnson's elusive conduct as observed in the traffic stop video and based on Trooper Craft's testimony. *See Terry v. Ohio*, 392 U.S. 1, at 19 (1968) ("the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."); *United States v. Brignoni-Ponce*, 422 U.S. 873, at 878 (1975) (reasonableness depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."); *see also, Pennsylvania v. Mimms*, 434 U.S. 106, at 109 331 (1977) (same); *see also, United States v. Stanfield*, 109 F.3d 976, 980 (4th Cir. 1997) (holding that the "inordinate risk" that exists every time "an officer ... approaches a person seated in an automobile," justifies a *per se* rule that drivers may be ordered out of their vehicles during lawful traffic stops, whether or not there exists any particular reason under the circumstances to believe that officer safety might be in jeopardy) (quoting *Mimms* 434 U.S. at 110). Thus, Trooper Craft's pat down search of Johnson did not exceed the Fourth Amendment.

---

[1] Under the reasonable balancing test, the Supreme Court has consistently approved of protective searches of persons, vehicles, and even homes, during routine and other lawful investigatory detentions, in recognition of the paramount interest in officer safety and the extraordinary risks to which law enforcement officials are exposed during such detentions. *See United States v. Stanfield*, 109 F.3d 976, 979–80 (4th Cir. 1997). Thus, for example, in *Terry v. Ohio*, 392 U.S. 1 (1968), the Court sanctioned the now-familiar "pat-down" search, or "frisk," because of the "immediacy" of the government's interest in officer safety, notwithstanding its conclusion that "[e]ven a limited search of the outer clothing for weapons constitutes a severe ... intrusion upon cherished personal security," *id.* at 24–25. If an officer possesses a reasonable belief based on "specific and articulable facts" that the suspect is potentially dangerous, *id.* at 21, reasoned the Court, then the officer is justified in undertaking the "limited steps" necessary to "protect himself and others from possible danger." *Id.* at 28. Moreover, evaluating the reasonableness of the search, the Supreme Court has clarified that the subjective beliefs of the police officer, whatever they may be, are not controlling, rather the Court examines the circumstance as a whole to determine whether the officer was reasonable in conducting a warrantless search. *See Whren v. United States*, 517 U.S. 806, at 814 (1996) (Their principal basis—which applies equally to attempts to reach subjective intent through ostensibly objective means—is simply that the Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, *whatever* the subjective intent."); *see* e.g., *United States v. Robinson*, 414 U.S. 218, at 236 (1973)("Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the officer] did not indicate any subjective fear of the [arrestee] or that he did not himself suspect that [the arrestee] was armed") (footnotes omitted); *Gustafson v. Florida*, 414 U.S. 260, at 266 (1973) (same).

On the other hand, the Court notes that although Trooper Craft testified that he feared for his safety after finding the concealed weapon that Johnson lied about, Trooper Craft did not arrest or detain Johnson in handcuffs at this stage. *See* ECF No. 55 at Exhibits 1 and 2. Although an officer's subjective intent is not a part of the Court's inquiry for purposes of evaluating reasonable articulable suspicion, the Court does consider Trooper Craft's actions (and inactions) when weighing the reasonableness of patting down Johnson because it must be supported by the "immediacy" of the government's interest in officer safety. *See Terry v. Ohio,* 392 U.S. 1, at 24-25 (1968).

Nevertheless, the Court finds that, at this timeframe in the stop, Trooper Craft identified more factors that would come to support his reasonable articulable suspicion that criminal activity was afoot: finding the concealed weapon after Johnson had lied about possessing it; Johnson stating that they had been in Arizona for 5 days (and then 4) which mismatched with the DEASIL records; and Johnson's inability to correctly spell his name of "Kristopher Clark" after numerous attempts. However, the Court does not credit Johnson's inability to correctly identify the place where they (Johnson and Garmon) were staying (e.g. "Spotsville Plaza" vs. Scottsdale Resort) as supporting reasonable articulable suspicion because that, on its own, is insufficient. However, as noted below, the second time that Johnson could not identify the place where they were staying was suspicious considering Garmon's contradicting story.

c. *Asking Defendant to Exit Vehicle, Asking Further Questions, Issuing the Citation*

At this stage in the stop, Trooper Huijkman and his canine partner "Dublin" had already arrived on scene at 11:37 a.m. *See* ECF No. 55 at Exhibits 1 and 2; ECF Nos. 42, 43. Trooper Huijkman was briefed by Trooper Craft. Next, Trooper Craft approached the vehicle to speak with Garmon. Although the video evidence was inaudible of their conversation, Trooper Craft testified that he

asked Garmon to step out of the vehicle and Garmon complied. *See* Hr'g Tr. at 34:12-35:21. Trooper Craft testified that he asked Garmon how she knew Johnson and that Garmon responded that he was a friend. *See* Hr'g Tr. at 36:6-23. Trooper Craft asked Garmon for the driver's name, and she responded "Chris" but advised that the driver might spell it with a "K." *Id.* Garmon also stated the driver's last name was "Clark." *Id.* Garmon stated Johnson might have left his ID at the hotel. *See* Hr'g Tr. at 37:1-4. Craft asked Garmon where they stayed in Phoenix and Garmon answered the Scottsdale Resort. *See* Hr'g Tr. at 37:5-6. Then, Craft asked Garmon how long she and Johnson had been in the area, and Garmon responded 3 or 4 days. *See* Hr'g Tr. at 37:7-13. As noted above, Trooper Craft did not exceed his scope in asking Garmon more questions or in asking her to exit the vehicle. *See generally, Pennsylvania v. Mimms*, 434 U.S. 106 (1977).

Next, Trooper Craft went back to speak with Johnson again. Trooper Craft told Johnson that he (Johnson) was not being truthful concerning the length of his stay in Arizona. *See* ECF No. 43 at 2-4. Trooper Craft ran a check on the handgun and confirmed the firearm had not been reported stolen. Craft also ran a warrant check on the name of "Kristopher Clark" which came back with no outstanding warrants. *See* Hr'g Tr. at 38:16-20. While Trooper Craft was completing the warning, Trooper Huijkman told Trooper Craft that both occupants stories reference for the trip contradicted each other. *See* Hr'g Tr. at 39:22-40:1. Trooper Craft completed the warning for the violations and explained it to both Johnson and Garmon. *See* Hr'g Tr. at 40:2-11.

At this stage, the Defendant argues that the purpose of the traffic stop was over because Trooper Craft completed the warning for the violations and issued them to both parties. *See* ECF No. 42 at Exhibit 1. However, in the hearing, Trooper Craft testified that although he issued the warnings, the traffic stop was not over. *See* Hr'g Tr. at 40:12-41:14.

The Court finds that, at this point, Trooper Craft identified more factors that would come to support his reasonable articulable suspicion that criminal activity was afoot: Garmon stating that they had been in Arizona for 3 or 4 days which contracted Johnson's statement and the DEASIL records; Johnson's inability to correctly state that they had been staying at the Scottsdale Resort after being asked a second time.

### d. *Prolong the Traffic Stop: Further Questioning & Dog-Sniff Search*

According to the police report, after Trooper Craft issued the warnings for the traffic violations, Craft told Johnson and Garmon that they were being dishonest concerning the length of their stay in Arizona. ECF No. 42 at Exhibit 1; *see also,* Hr'g Tr. at 40:12-41:14. Trooper Craft proceeded to ask more questions. Trooper Craft asked Johnson and Garmon whether there was anything illegal in the car and Johnson answered, "No sir." *See* Hr'g Tr. at. 43:19-44:2; *see also,* ECF No. 55 at Exhibits 1 and 2. Then, Craft asked Johnson and Garmon whether they were responsible for everything in the car and Johnson answered, "Yes sir. There's nothing in there." *See* Hr'g Tr. at. 44:4-7; *see also,* ECF No. 55 at Exhibits 1 and 2. Next, Craft asked who rented the car and Johnson responded he rented the car. *See* Hr'g Tr. at. 44:8-10. Finally, Craft asked Johnson and Garmon whether they both had luggage in the trunk. Johnson and Garmon both answered yes. *See* Hr'g Tr. at. 44:14-19. Craft asked for consent to search the car and Johnson answered, "Sure!" *See* Hr'g Tr. at 44:20-25. Johnson then asked Craft why he wanted to search the car. *See* Hr'g Tr. at 45:3-12. Craft replied he believed Johnson and Garmon were involved in illegal activity. *Id.* In response, Johnson told Craft he did not consent to search the vehicle. *Id.*

Immediately thereafter, at approximately 11:55 a.m., Trooper Craft asked Trooper Huijkman to deploy his drug dog on the white Kia. At approximately 11:55 a.m., Trooper Huijkman commenced a screening of the white Kia with drug dog "Dublin." "Dublin" alerted on the driver's

side window, trunk seam, and passenger's door. In the trunk, Huijkman discovered an opened potato chip bag containing approximately 865.43 grams of methamphetamine of 80% or greater purity. Johnson and Garmon possessed the 865.43 grams of methamphetamine. Johnson and Garmon were placed under arrest and secured in the rear of a patrol vehicle.

*      *      *

The Government argues that Trooper Craft's actions did not violate Garmon's Fourth Amendment rights because the totality of the circumstances provided reasonable articulable suspicion of ongoing criminal activity which justified the dog-sniff search. ECF No. 43 at 9-11. In response, the Defendant argues that Trooper Craft's actions demonstrate that he no longer had suspicion that further criminal activity was afoot. ECF No. 42 at 5. Specifically, after Trooper Craft had given Johnson the citations and explained them, the traffic stop was complete and Johnson and Garmon were no longer seized. Thus, they were free to go. However, Defendant argues that Trooper Craft exceeded the scope of the traffic stop by asking Johnson further questions about what was in the car and consent for a search. Moreover, Defendant contends that even though Johnson responded to Craft's questions and provided consent for the search, Johnson recanted his permission for the search before the K-9 was deployed.

The Court finds that although Johnson initially provided his consent to search the vehicle, he quickly recanted *before* Trooper Craft initiated the dog search. Thus, Trooper Craft's sole basis for conducting the dog-sniff was on independent reasonable articulable suspicion to prolong the traffic stop. *See United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009) (holding that during a traffic stop, an officer may also conduct an exterior dog-sniff of the vehicle, if it is "performed within the time reasonably required to issue a traffic citation") (internal quotation marks omitted).

The Court finds that Trooper Craft did have independent reasonable articulable suspicion to prolong the traffic stop. *See Branch* at 336 (4th Cir. 2008) (holding that once a vehicle is stopped, if a police officer gets consent or "a 'reasonable suspicion' that illegal activity is afoot," the officer can prolong the stop for investigation into a matter outside the scope of the initial stop); *see also, United States v. Digiovanni,* 650 F.3d 498, 507 (4th Cir. 2011) (noting that an officer cannot investigate "a matter outside the scope of the initial stop" without the motorist's consent or the reasonable, articulable suspicion of ongoing criminal activity).

As detailed above, the Court finds that there is overwhelming evidence supporting Trooper Craft's reasonable articulable suspicion that crime was afoot and, thus, gave him probable cause to conduct a dog-sniff search. In support of this determination, the Court finds that the following factors are most relevant: the vehicle's two-day quick in-and-out of Arizona based on the DEASIL plate reader system; neither Johnson nor Garmon had driver's licenses or any form of identification, the lack of the rental agreement, Johnson's abnormal physical demeanor (notwithstanding the Arizona heat); Johnson carrying a concealed firearm and lying to Trooper Craft multiple times about it; Johnson's and Garmon's conflicting stories about their presence in Arizona, timeline, where they were staying, and purpose there; Johnson possibly being a prohibited person since Johnson admitted he was previously incarcerated; and, Johnson's inability to properly spell his fraudulent name ("Kristopher Clark") despite numerous attempts. The Court notes that Trooper Craft's unrelated inquiries during the traffic stop which led to the aforementioned factors were permissible. *See Arizona v. Johnson,* 555 U.S. 323, at 333, (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop"); *see also, United States v. Green,* 740 F.3d 275, 281 (4th Cir. 2014).

Furthermore, Trooper Craft's incremental extension of the traffic stop is justified because as Trooper Craft conducted the traffic stop, he continued to discover more evidence of criminal activity. *Cf. Rodriguez v. United States*, 575 U.S. 348, at 357 (2015) (dismissing the Government's argument because it is in effect establishing that "by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation."). That is, as noted above, at each stage of the investigation Trooper Craft obtained factors supporting independent articulable suspicion to "incrementally" extend the traffic stop until he finally had sufficient circumstances to merit a dog-sniff search. *See United States v. Green,* 740 F.3d 275, 280 (4th Cir. 2014) (citing *Branch,* 537 F.3d at 336) (the Fourth Circuit has held that "to prolong a traffic, stop beyond the scope of a routine stop, the officer must have either the driver's consent or a reasonable suspicion of illegal activity"); *see id.* ("However, where a delay in conducting a dog-sniff can be characterized as de minimis under the totality of the circumstances, the delay does not violate the defendant's Fourth Amendment rights").

Although the Supreme Court has held that a traffic stop "prolonged beyond" the point necessary to effectuate the traffic stop was "unlawful," *Rodriguez v. United States*, 575 U.S. 348, at 357 (citing *Caballes,* 543 U.S., at 407), the Court has also held that dog-sniff after a traffic stop is lawful if it is independently supported by individualized reasonable suspicion of criminal activity. *See Rodriguez*, 575 U.S. at 358 (2015); *see also, Terry*, 392 U.S. at 21 (An officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts," establish reasonable suspicion of criminal activity).

In summary, the Court finds that the dog-sniff search after issuing the traffic warnings was supported by individualized reasonable suspicion of criminal activity, and, thus, was not an

unlawful prolongment of the traffic stop. Therefore, the Court finds that the Government did not violate Garmon's Fourth Amendment rights.

## B. Fifth Amendment Analysis

The Fifth Amendment protects defendants against "any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972) (emphasis added); *see also Doe v. United States*, 487 U.S. 201, 213 (1988) (the Court noted the Fifth Amendment intended to "spare the accused from having to reveal, directly or indirectly, his knowledge of the facts relating him to the offense."). Also, the Supreme Court found that any information that could lead to other evidence qualifies as "self-incriminating." *See Fisher v. United States*, 425 U.S. 391, 410 (1976).

### 1. Custodial Interrogation

First, the Court must determine whether Defendant was subject to a custodial interrogation. An individual is considered "in custody" whenever law enforcement officials conduct a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Interrogation is "express questioning" or any activity by law enforcement officers "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

Here, the Court finds that Defendant was subject to a custodial interrogation. It is undisputed that Garmon was subject to a formal arrest and not free to leave. ECF Nos. 42, 43 at 6.

### 2. Knowing and Intelligent Waiver

Absent a knowing and intelligent waiver of the Fifth Amendment right against self-incrimination and the Sixth Amendment right to the assistance of legal counsel, a confession made

by a suspect during in-custody interrogation is inadmissible in evidence against him. *Miranda v. Arizona*, 384 U.S. 436 (1966). Even when the suspect has made a valid waiver, a confession made later is inadmissible if it appears that it was made involuntarily. *Miller v. Fenton*, 474 U.S. 104 (1985). Whether such a confession was voluntary, or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances. *Id.* at 112. Moreover, while each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. *Colorado v. Connelly*, 479 U.S. 157, at 163–64 (1986)

In the instant matter, after her arrest, at approximately 1:30 p.m., Detective D. Burns of the Arizona State Police advised Garmon of her *Miranda* rights. When asked if she understood her rights, Garmon answered "Yes." *See* ECF No. 43. Garmon agreed to answer Burns' questions. Then, Garmon waived her *Miranda* rights. *Id.; see also, Miranda* 384 U.S. at 467 (Holding that an interrogation occurs when the suspects is subject to "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."). Therefore, the Court finds that Defendant was subject to a custodial interrogation.

Furthermore, at the hearing, Defendant did not make any factual contentions that she was in an oppressive environment or that her waiver was not knowing or intelligent. Thus, the Court finds that Garmon made a knowing and intelligent waiver of her *Miranda* rights and that Garmon's incriminating statements are admissible.

## C. Fruit of the Poisonous Tree: Exclusionary Rule Exceptions

In the alternative, even if the Court had determined that the dog-sniff search exceeded the scope of the search because it was not based on individualized reasonable articulable suspicion, the Court finds that the exclusionary rule would still not apply because the fruit would have been inevitably discovered and, thus, the evidence is admissible.

"[T]he exclusionary sanction applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470 (1980). The exclusionary rule covers both the "primary evidence obtained as a direct result of an illegal search or seizure" and, relevant here, "evidence later discovered and found to be derivative of an illegality," the so called "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984).

Here, the inevitable discovery doctrine applies as an exception to the exclusionary rule. The inevitable discovery doctrine states that the items may not be suppressed if the government establish by a preponderance of the evidence that law enforcement would have "ultimately or inevitably" discovered the evidence by "lawful means." *Nix v. Williams*, 467 U.S. 431, at 444 (1984); *see also Utah v. Strieff*, 136 S. Ct. 2056, at 2061 (2016); see also, *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017). "Lawful means" include an inevitable search falling within an exception to the warrant requirement, such as an inventory search, that would have inevitably uncovered the evidence in question. *United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998).

Here, neither Johnson nor Garmon possessed a valid driver's license. Moreover, Kristopher Clark, the individual who rented the vehicle was not present. At the hearing, Trooper Craft testified

that pursuant to Arizona State Law and Department Policy, the Troopers have the discretion to allow someone without a driver's license to leave or to impound the vehicle. *See* Hr'g Tr. at 84:8-21. However, since Defendant Garmon had a revoked license, Trooper Craft testified that he would have taken her to the bus station and, based on the circumstances, he would have impounded the and conducted an inventory search. *See* Hr'g Tr. at 85:2-10; *see South Dakota v. Opperman,* 428 U.S. 364, 374-76 (1976); *see United States v. Banks,* 482 F.3d 733, 739 (4th Cir. 2007) (internal quotation omitted) ("A proper inventory search is merely an incidental administrative step following arrest and preceding incarceration conducted to protect the arrestee from theft of his possessions, the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing.") (citing *Illinois v. Lafayette,* 462 U.S. 640, 644-46 (1983).

At the hearing, the Government established that Trooper Craft would not have allowed Johnson and Garmon to continue to drive off even after completing his warnings. Accordingly, the Court finds that the inevitable discovery doctrine would have applied in this case.

### IV. CONCLUSION

Based on the foregoing reasons, Defendant's motion is **DENIED.**

The Clerk is **DIRECTED** to send a copy of this Order to the United States Attorney and Defendant.

**IT IS SO ORDERED.**

Norfolk, Virginia
July 6 , 2021

UNITED STATES DISTRICT JUDGE